Good morning. May it please the court. I will probably reserve three minutes for rebuttal. Generally this morning I want to focus on the issues of mootness and whether this case is properly before the court and then the Department of Justice was going to focus on the merits of the case and what tests should be applied in this case and indeed in any case that deals with speakers in public forum in the era of COVID. So if the court wants to spend more time on that issue I'm willing to cede some of my time to additional time to the DOJ. COVID-19 has been with us for nearly a year and during that time we've seen infection rates ebb and flow throughout the country and here in California and while recently there have been some very encouraging news about vaccines there's also been very discouraging news as far as the numbers of infection rates. In California they've been nearly doubling over the last week and yesterday Governor Newsom announced that the state is going to be what he said pulling the brake on the blueprint for a safer economy and that will result in 94.1% of California's population being in the most restrictive tier. The governor also stated that in California they would continue to update the blueprint and based on the best available public health data and science and I mentioned these facts not only for context because they have a specific relevance to the arguments this court will hear today. On one hand the response to the increasing number of infections the state will return to more restrictive measures. Mr. Sperling we're pretty familiar with what's going on but what interests me here is whether or not this appeal which is an appeal from a denial of a temporary restraining order is properly before us and assuming that it is whether it's now moot because the executive order that was written that's the source of the of the your lawsuit and the subsequent directives from the health department or this whatever his title is have changed so that as I understand it under the current executive regulatory directive scheme you could your clients could hold an outdoor rally. Yes your honor currently they can. So assuming that there's a proper appeal from the denial of a preliminary injunction what what relief could be obtained through a preliminary what's there to do? Right your honor so the the district court actually dealt with this question as you know when the defendant. That's different that's a different question because he would you the state had moved to dismiss the complaint and whether or not the complaint was moot. I'm asking you I'm asking you a very a different question. You're appealing the denial as I said of a TRO. Why is not that proceeding moot? That is what what can we do for you? Well and and the answer to that is maybe today or tomorrow that total ban on any outdoor gatherings for any purpose including demonstrations could go back into effect and because of that my clients risk it at any moment losing that right and I want to point out one fact to the court which I just became aware of and this demonstrates how easily it is for the government to go back to a different standard. After this case was briefed to the to this court the California Highway Patrol on their website that that talks about the permitting process for the state capital grounds further restricted the circumstances under which someone could obtain a permit such that there is a there's currently a maximum number of 200 people for any person who seeks a permit. The papers say that there's an unlimited number for the capital grounds or anywhere else that has changed and it was changed without any fanfare without a press release or anything else that the defendant the California Highway Patrol simply went on the website and changed the number. Mr. Spurline let's let's assume for a moment that that fact were in the record which it isn't. Even if that fact were objectionable and that is even if your clients thought that a 200 person limit was unreasonable shouldn't that factual question that partially factual question be litigated in the district court first without our reaching the merits of that limit? Well the the reason we're seeking guidance from the court here is because in its order for the temporary restraining in the district court set forth a standard that is literally impossible to meet and the courts encouraged the litigants to seek some clarification from this court as to what tests should apply and that important information that important guidance to the the court and to frankly any district court as to what whether the standard changes because of the drastic nature of COVID is a really important question for the court to understand so that as these things shift and change which they're bound to do and we understand why then it will have the information that it needs to make sure that the free speech rights of people who are interested in speaking to their government about these issues will be So let me, could you clarify for me as you in your remarks if your clients were to apply today for these permits what would happen? They would be denied. On what basis? On the basis that the California Highway Patrol has limited the number of speakers to 200 on the state capital grounds and my clients desire to have a crowd the size of a thousand which you know the state capital grounds is 144 square acres over I think 1.7 million square feet and if people were socially distanced in the way that almost all of us are used to hearing about six feet even 12 feet even more than that could be accommodated masks could be worn etc. Now let me clarify one thing it was my understanding at the time of the applications that these outdoor large gatherings were not permitted, is that correct? No no yes they were not permitted but neither was any size gathering or even standing in front of one's house with a picket sign one could not leave the house because it wasn't an exception under stay at home orders. Mr. Smith did you want to go ahead go ahead Judge Tiger. Well I'm just looking at the clock and I do want you to address a little bit this other of the two main questions which we started with and that is why the case is appropriately in front of us notwithstanding that this is the denial of a TRO and not a preliminary injunction especially given that Judge Mendez went out of his way to invite the appellants to proceed further with a preliminary injunction and even to supplement the record if they wanted that's the way I read his remarks and they declined that invitation and then appealed from the TRO. So I just wonder why is it that we even have jurisdiction to entertain the appeal? Well in the first instance the standard is that if the effect of the ruling is such that it would be the same as the effect on a preliminary injunction then there's the right to appeal and my position is that because of this standard was set where the court said essentially the court said you can't guarantee me that no infections will happen and therefore it's narrowly tailored enough. Nothing that we could present to the court would change that because we could never 100% guarantee that no infections would occur and so we think that that standard is off but we also think that you know what could we add at that point to the record that would possibly overcome that standard. But isn't one purpose of this rule so that neither you nor I nor my colleagues can speculate about what more the plaintiffs would have presented? I mean I agree the tone of Judge Mendez's remarks from the bench was not you know maybe as as welcoming to your application as it could have been but he did invite you to proceed further with a preliminary injunction request and correct me if I'm wrong but I think the standard is that it has to be unmistakably clear to this court that an injunction application would have been futile and I'm not sure that standard's met here. Your Honor I'd happily answer that question but I would like to reserve some some time. I will briefly say that I did not read that those remarks quite the same way. I was at the hearing there was a lot of talk of settlement. I encouraged the court to maybe allow us to sit down with the state and come up with some other standards and so the court had really invited us to come back in that capacity. I took his comments to mean you of course could bring a preliminary injunction. I don't think it's gonna be any good. You have the option to go up and appeal. So with that I'd like to reserve the remainder of my time. Okay so let your co-counsel Mr. McGeer McGeer McGeary? Yes, Your Honor. McGeary? Go ahead. May it please the court Alexander Mowgery, Civil Rights Division, United States. Your Honor, the district court's ruling that the First Amendment allows the state of California to enact a ban indefinite duration on all in-person political protests across all outdoor and indoor locations in California, including speech against those very restrictions and in the traditional public forum of the state cap program cannot stand. That's true for three reasons, Your Honor, even stipulating California's significant government interest and I'd like to explain those. I would like to just pick up on the appellant's counsel's discussion with Your Honors. Your Honors have raised questions about mootness. So I'd make two points. I'm not authorized to say the United States believes it's not moot, but I would direct Your Honor's attention to the appellants have briefed extensively exceptions to mootness, in particular the voluntary cessation requirement. And here we don't have a legislative change. We have a policy change that is shifting. We also do not have an undertaking by the state of California in their brief that they will not reinstate these bans and Mr. Spurline described how just likely it is that that may recur. So while I can't for the United States say that it's not moot on those grounds, I would invite the court to look at those and also take a look at the district court's opinion on this, where I believe the district court has already ruled in the context of not dismissing the case as moot that the voluntary cessation requirement applies. So I think that gets us before you. We also have suggested that you can vacate and the vacate and remand that will wipe out the precedential value of this opinion and ensure that other district courts don't follow it. We think it's essential that your honor to do that. It's being cited by other courts, and it simply stands for a fundamental proposition of law that's antithetical to the First Amendment. And that's so, as I said, for three reasons. First, it failed the time, place and manner test because Internet, television and car based protests do not leave ample alternative channels of communication open in the context of a total 24 7 ban. It's also an independent violation of the time, place and manner. Our restriction, just as this court held that a city wide ban on all demonstrations in Collins after the Rodney King riots was invalid. This statewide ban burdens substantially more speech than is necessary, and we know that based on the facts on the ground as since the notice of appeal, for example, it's clear that California can create a regime, as Mr Spurline said, with alternatives. Those could include testing, masking, social distancing, the things that the plaintiffs asked for here that are less restrictive. Mr Majority. With respect, in light of what the governor's announcement yesterday, why do you say it's clear that that can be done? Where can we look to see that that has clearly been done? And the public health is adequately been protected. Also, Your Honor, I would say the the First Amendment has never allowed the government to say that there shall be no risk. The question here would be also substantial alternatives that allowed a baseline level of risk that say, I do think, Your Honor, we're asking for something very simple and narrow. Ah, holding by this court that a total ban 24 7 across the state is not allowed. Then the court could go that argument. I understand that you just said as a matter of fact that something is clear, and I'm asking you to point me to the facts that show that there is a safe way of restricting speech. That's that's all. So So I would say, Your Honors, I would point to California's guidelines at the time we filed our appeal that allowed a 100 capacity limit. So at that time, at the least, California believed that that was an alternative. But, Your Honors, just Tiger, what I would say is, even if you do not credit that argument, there's the separate and independent grounds that Judge Pi has raised in the Minotti case, which is this district judge, with respect, believes that the Internet, television and electronic communications are adequate substitutes for in person political protest. That is a proposition of law that this court needs to correct. And if it does not correct that proposition of law as we go into more restrictions as we move forward, this district judge, I would believe, will not entertain any of the arguments that Mr Sperline is making because the court has believed believes that a total man is constitutional. Thus, therefore, anything less than that would have to be constitutional. And so just to explain that a little further on that prong ample alternatives, the Minotti majority said that the Supreme Court has not struck down time, place or matter alternatives unless, quote, the government will foreclose an entire medium of public expression across the landscape of a particular community or setting. That's exactly Collins, and that's exactly this case, Your Honor. And that's at 1138 Minotti. Your honors, we are not. We're not quibbling with California's legitimate government interest. I'm stipulating they have a significant government interest. But if this court ratifies or allows to stand the proposition that in a state can ban all protest 24 7 indoor and outdoor all days of the week, that's a startling proposition of law. And I would submit that just categorically that can't stand now. The state may say, Well, the supports of applied and upheld total bans before. I am not aware of a single case to do so in the context of traditional public forums and in person protest. They point to the mainstream of the First Amendment. And so, yes, total bands are sometimes okay. Things like camping. But I harken back to the 19 thirties case Schneider versus state. This wasn't in our brief, but it's a canonical First Amendment case. Hand billing. The Supreme Court said that local municipalities can't ban hand billing across the jurisdiction. And I would submit to your honors that First Amendment in person political protest is far more critical than that on your honor's there. What I would say is just just my time is supposed to expire. The Jacobson standards is critical here as well. The plain palpable evasion standard is the wrong standard. And if you take a look at the South Bank and currents by Justice Roberts, you'll see he doesn't apply the plain palpable standard. He applied the traditional free exercise jurisprudence and then cites Jacobson. So what I would say to your honors, you may hear a lot about Jacobson when the state proceeds, I would say, Please do not endorse the proposition of plain palpable is correct. There's no Supreme Court authority for that, and there's no Ninth Circuit authority. So when the court finds the appeal falls into an exception to mootness at the plaintiff's request or vacates under Munson, where it should explain Jacobson's not a blank check. The Internet and television are not adequate substitutes for Internet for a lot of challenge below plaintiffs. Proceed. Thank you, Counsel. Okay, we'll hear from Mr Klein. Um, next may place the court on Joshua Klein on behalf of the defendants. Uh, it is helpful to take a step back and remember the context controversy in late April when the plaintiffs applied for their permit permit and were denied. The epidemic was relatively new, and the scientific understanding of it was in an early stage. Many places simply overwhelmed entire health care system, and that was the content which California's public health authorities instituted restrictive but temporary measure that issue that the plaintiffs are challenging to safeguard life. Now, in challenging that measure today, the court to opine on a several novel and very sensitive constitutional issue. But there's no need. And in fact, there's no jurisdiction. First, the district court decided only the plaintiff's T. R. O. Motion based on the very limited record that such an expedited motion allows, right? We had only four days to submit our evidence. The district court expressed openness to the plaintiff, seeking a preliminary injunction decision afterwards, which would have allowed it would have been appealable under section 12 92. But because the plaintiffs didn't take that opportunity, there's no statutory jurisdiction for their interlocking appeal. And plaintiffs rushed to appeal caused their second jurisdictional problem, which is that by June 2nd, the restrictions they're complaining about were entirely gone. Now, the plaintiffs have not sought any permits for demonstrations during the last five calling your your brief cites the Rosebrook case. It does not engage with its five factor test. And I read that case and subsequent cases, including courthouse news, which is not cited by the parties, but which the circuit decided in January as putting the burden back on the government to demonstrate mootness using that five factor Rosebrook test because these restrictions that we're talking about were never committed to legislation. So that was a long preamble. But my question is, can you walk me through the Rosebrook factors and explain to me why under that test this case is moved? Well, Your Honor, first, let me agree with you that since it's not legislation per se, the Board of Judges presumption does not apply. And I also am going to agree with you that there's a the burden is on us generally to demonstrate that voluntary cessation exception doesn't apply. But let me let me say one other thing about burdens first, which is that in the it's also true that the plaintiffs have a burden to show that these plaintiffs will re-engage in the activity, namely seeking a permit, that caused this, that led to the conflict. And they haven't sought permits in five months. The plaintiffs cite that point on page 14 of their reply brief. The Supreme Court applied it as recently as Sanchez-Gomez case in 2018. So I think that I think that as ultimate burdens go, it's still the plaintiffs have not shown that they're going to apply for a permit for protests they haven't sought to do in the last five months. With respect to other points, and I would have to look up the Rosebrook factors to go point by point through all of them, but I will say this change the governor's orders, which incorporate state health directives, do carry the force of law. They're more akin to a formal regulation than they are to simple enforcement emails, but they also have some enforcement effect. And so under cases like, I believe Rosebrook is the VA hospital police case, under cases like that, they do in fact carry significant weight. Is the government prepared to concede today that it will not reimpose a total ban? No, Your Honor, we're not able to concede that, but if that were to happen, which is highly speculative, and if the plaintiffs were to seek a permit, which of course is only in their control and they haven't done anything or shown anything about it, then, you know, any future total ban would be based on scientific information and rates of infection, hospitalization, PPE availability that would obtain in the future that we don't know today. So I'm not sure that a decision from this court would settle anything very much about that. I also don't think that this court can simply issue advisory opinions as I hear the United States basically suggesting that the court finds there's no mootness. And the United States brief did say that the case is not fit for judicial decision and that the proper thing to do is to vacate because it's moot. So Mr. Klein, let me help you with the Rosebrook factors and then you can policy change is evidenced by language that is broad in scope and unequivocal in tone. Certainly, I mean, the present directive is broad in scope and unequivocal in tone. It doesn't say though, does it make any statement at all about reimposing or, you know, they're not going to do it again or anything like that? No, Your Honor, and let me be clear, there's no promise to not reimpose this in the future, should future circumstances necessitate it. If that were the test, then mootness would not be demonstrated. The plaintiffs would still have a very substantial section 1292 problem before this court. Right. Okay. So number two is the policy change fully addresses all the objectionable measures that the government officials took against the plaintiffs in the case. I think that is very clear, Your Honor. At bar 72, plaintiffs counsel told the district court that they would be satisfied if they could get permits for a 10 or 50 person protest. That's fully addressed. And they told this court at page 50 of their opening brief that they wanted the state to adopt on an interim basis, a more narrowly crafted set of provisions. That's clear under the, under the policy as well. The case in question was the catalyst for the agency's adoption of the new policy. That's number three. And I don't think it's clear that this case was the catalyst, but the concerns that this case represents were certainly the catalyst. Right. California is very sensitive to the First Amendment concerns and has been working very hard to try to accommodate those as far as public safety allows. Number four is the policy has been in place for a long time when we consider mootness, that means the court, us. And so there's change in policy. Yes, Your Honor. And this policy has been in place for over five months. That's significantly longer than the restrictions that the plaintiffs are complaining about. And the last one is since the policy's implementation, the agency's officials have not engaged in conduct similar to that challenge. And Your Honor, I suspect that weighs in our favor. Certainly any allegations to the contrary would be pretty fact-intensive. But I think that the plaintiffs acknowledge, I don't think that the plaintiffs would say that they would have been denied a permit properly requested for the, you know, this news about a 200-person cap is new to me and I don't have any information about that. But they were asking for a 10-person cap. So then there's one proviso that the Rosenberg court noted, which is that you're less inclined to find mootness where the new policy could be easily abandoned or altered in the future. Now, isn't that the problem here? And Your Honor, we admit that the state does need flexibility to respond to new events. But let me point out something. Rosebrook does not eliminate the requirement that the plaintiffs show that they would be applying for the permit. And their behavior since early June is that they haven't. And when they were asked about this, the extent that later events in the district court are not, when they were asked about this in the reconsideration hearing, they really did not have an answer for why they had not applied for a permit at that. And I think that that in itself weighs in favor of moot. If Your Honor would give me a chance to address the 1292 issue, because I think that non-constitutional jurisdictional ground is frankly... I was just going to ask you about that, but go ahead. Well, so I want to point out how different this case is from the cases where functional equivalence to a preliminary injunction has been found. Judge Mendez stressed the thin record at this point because we're at the TRO stage. That's at page 40 of the exodus. He said his decision was, quote, not the word on what's going to happen six months from now. That's at page 54. I can't think of a case that he's not deciding a preliminary injunction to govern the case until the conclusion of proceedings. And, of course, the order transcript and the hearing and the docket show that the only thing denied was a TRO. And adhering to 1292's limits in this circumstance, that's a matter of fairness to the defendants. We had four days to submit our evidence, and while that evidence was certainly strong enough to prevail, I think it's self-evident that we would have been able to present the district court, and eventually this court, with a stronger and more full record if we'd had the slightly longer period of time that a preliminary injunction meeting allows. It's a matter of fairness to this court, which should not be asked to opine on sensitive, novel constitutional issues without having been You're raising an interesting point I had not thought of before the argument, and I apologize if this is in your brief and I'm not remembering it. But one of the points you're making is that the requirement that we wait until an injunction has been issued or denied before accepting an appeal protects a fairness interest to you and your clients. Do you have a case for that point? Because it's an interesting point. Your Honor, I'm not aware of a case. I think that it's implicit in Section 1292's requirement, and in the fact that 1292 applies equally to grants and denials of PROs and preliminary injunctions. Now, this is not functionally equivalent in the way that religious technology was, because Judge Mendez said he was open to further evidence which might, quote, change my mind, right? Whereas in religious technology center, the district court there had the case on remand. The Ninth Circuit had vacated a previous preliminary injunction. The district court just said the circuit does not believe that an injunct that, you know, interlocutory relief is appropriate in this case. And we don't have anything to talk about. That's the opposite of what Unlike Andrus, right? Because in Andrus, the court said that time was of the essence and delay would effectively foreclose interlocutory relief. And footnote six of religious technology center says Andrus also appeared to have a live evidentiary here. Here, waiting and giving the parties and the district court a chance for preliminary injunction would just have meant that this appeal would have been heard about a month, six weeks later than today. Let me ask you this. Is there, you know, when you read Judge Mendez's order, it seems like it's a legal analysis of the restriction. It's pretty clear at the time. What more could they have produced as evidence? Your Honor, I think the record more fulsome. What what else was there? What else was needed? Your Honor, the legal analysis applies the law to specific fact. How much restriction was medically necessary? What were the risks of allowing this gathering of 500 or 1000 people with food trucks from around for three to four hours? If you read the application from all around the state to return to their community, I think that either under Jacobson, is this a plain violation of constitutional rights? We're under other tests. Is this, um, does this burden substantially more speech than necessary for a time, place and manner point? Or what is the effectiveness of alternatives? Or even under strict scrutiny? Uh, how necessary was this? Those were all back intensive and certainly plaintiffs could have, if they have any such evidence, put in evidence that it was not necessary. And we could have significantly bolstered our evidence about the necessity. Um, and let me just say that the last thing is that this is different from, uh, this is different from cases where what the district court did was so clearly not TRO related because of timing issues, right? And that occasionally comes up where a TRO lasts longer than a typical period. And, um, uh, I think all of the members of this court happened to have involvement in an East Bay Sanctuary case where that was the basis for treating a TRO as a preliminary injunction. And there's nothing like that here. The plaintiffs could have taken judgment as upon this application. Um, do you want to turn to the merits for just a moment for your remainder of your time? Just respond to what the government, the government's argument. I'm happy to do that. Your honor, the restrictions that were in place in late April were constitutionally justified at the time and on the record before the district court, like COVID is an extremely deadly disease. People can not know that they're infected and yet spread the disease widely. Um, and the exponential spread from any one transmission can overwhelm an entire health care system. Restrictions lasted a short time, shorter, in fact, than the restrictions that the United States imposed their seat of government. Um, there were five weeks of permit denials and then we resumed. Um, there was no safe way demonstrated to hold 500 and a thousand person protests. The only competent medical or public health evidence was Dr. Watts's declaration, which showed that large gatherings post a severe risk. And the plaintiffs submitted literally nothing to counter that. Um, and last, the restrictions were viewpoint and content neutral. And let me be very clear. The state agrees that we need to remain viewpoint and content neutral. There's no dispute about that. And any contention that we were not is based on the plaintiff's dubious interpretation of events that post a decision and that come to this court only through, uh, news articles that the plaintiffs have submitted. And that, uh, I don't believe are a proper basis for decision. Um, and so given all of that, uh, the denials of permits to these plaintiffs was proper under any conceivable test. And let me, uh, note that the plaintiff's opening brief does not raise an overbreak here. So they cannot complain here on appeal that, um, there are 501,000 person protests might have been legitimately banned, but that someone else might have had a 20 or 50 or a hundred person that would have been, uh, they also can't complain that, um, uh, that the, uh, the permits they applied for should have been granted on things that they said later about their interest in social that we're not in actual permit application. Our supplemental excerpts 73 and 78, and those do not say anything about instructing, uh, attendees to, uh, socially distance or, uh, anything like that. They just say there are going to be 500 or a thousand person protests for three to four hours. Uh, and in the case of Mr. Gibbons, his application, that there would be an opportunity, uh, distance. Um, so I, I think that, you know, as, as we know, there are baby and novel constitutional issues in this case, because of the unusual circumstance, I don't think that courts should be, or are permitted to be in the habit of, uh, addressing hypothetical, uh, novel constitutional issues. Um, just because they're, uh, they think that that would be useful in the overall jurisprudence of the nation when there's not jurisdiction for statutory and constitutional. Well, Mr. Klein, putting the 1292 point to one side for a moment, you've acknowledged, you've just said that these are interesting and important issues that courts need to address. And I agree with that. Um, but given that the government has expressly reserved to itself, the right to reimpose the same restrictions, when will we have the opportunity to address those issues? But your honor, if the plaintiffs were to reapply for the permit and actually be denied under some re-imposed hypothetical re-imposition of these conditions, there are a couple of possibilities. First, they could seek a preliminary injunction. And, um, if that's denied, they could seek a injunction pending appeal from this court, right? That's one way to get parole, uh, ruled. They didn't do that here. And then also there is the option of mandolins on the TRO decision. That's how the fifth circuit, uh, some issues, uh, under Jacobson in Ray Abbott, um, and the plaintiffs haven't sought that here either. So there's nothing that stops plaintiffs who have an actual contrivance from getting an appellate decision by following it's staff. Um, they can't run to this court in violation of the rules with a moot contrivance. If there are no further questions about... I have two kind of very minor procedural questions. One, do you agree with the, um, with your opposing counsel that if we were to conclude, I'm just saying, if we were to conclude that this appeal is moot, that the district court's order should be vacated? Let me preface my response by saying we don't care very much because the district court order has no practical effect. Right? And that's precisely the reason why we did believe we had to tell the court that it's not really within the classic scope of Muncie where there's no issue preclusion or claim preclusion because it's not final. Um, it's not, you can't even say that it has some kind of binding precedential effect, um, on other courts or on this court, right? Unlike when the Supreme Court may vacate a decision by this court and it doesn't determine future proceedings in the district court. In this case, as Judge Mendez has made crystal clear. So, um, we don't think it technically is under, uh, Muncie where, but it's not a big issue. Okay. My, my last question is, uh, what's the status of the case in the district court today? Um, so the status today is that an answer was filed. Uh, um, an answer was filed on August 11th. Uh, discovery is, uh, we'll close in 2021. Uh, and the trial has been set in 2022. And I don't think any party is objective to that, uh, that schedule. And of course, there's okay. Thank you. Uh, so we would ask this court to dismiss the appeal or in the order of denying plaintiff's request. Okay. Mr. Sperling, you reserved about two minutes. Yes, your honor. Um, one thing just in rebuttal to, um, the indications that the courts, uh, had whether invited in fact, a preliminary injunction or not. Just want to point out that in the, in the portion of the transcript on the issue, on the, um, TRO hearing the courts where he was, the court was explaining, um, how it was ruled. The court said, I would say to your clients, it doesn't end with the district court. Um, and then later in the motion to dismiss, um, the court said, we're all going to get some guidance from the district court. So it's, it's clear to me that the district court was, if not open to, uh, having this court review, it's, uh, um, ruling on the TRO, um, even perhaps inviting that and, and being at the hearing, it was clear the court struggled with this as we all do. This is a really difficult case, even for someone who is a free speech advocate. I understand the risks here and I understand the concerns of the court, but in reality, this is not a novel case. In the hundreds years or so since Jacobson, the Supreme Court and the Ninth Circuit have created a very, uh, dynamic and extensive way to deal with free speech issues. And those, um, if they're applied to this case, they will work. So, uh, we're not really looking for a, a new ruling. What we're saying is we want to make it clear that even in COVID, the court's wise test for evaluating first amendment rights do apply and will work. Okay. Thank you, counsel. We appreciate you. Judge Pius, may I ask Mr. Stirling one question? Yes, go ahead. Something else has just occurred to me during this argument, and it's not raised in the parties briefs, but it's, I think it's not a bad summary of the facts and that is that, um, I wonder whether this case is distinguishable in some way from the total ban cases on the grounds that what happened here is that the state, like the rest of the world was caught flat footed by this pandemic. And so the state just sort of held its breath for five weeks. It imposed this ban sections now are worse than they've ever been. It hasn't, it hasn't put the band back into effect total ban. And so is, I guess I'm struggling to frame this question, but is there a time limited element to the way this was done? We need to consider in applying a first amendment jurisprudence. Well, one thing that that issue raises in my mind, the fact that a total ban has not been re-implemented yet. And of course we don't know if it will be in the future, but that's certainly calls into question whether this was a narrowly tailored, absolutely required, um, a ban or, or a way to approach this. So that's one thing I would say in response. The other thing that I would say is yes, in times of emergencies, we sometimes make mistakes. You look at the Karamatsu case, you know, it took us a long time to look back and say, we got that wrong. It's, um, people are scared, tensions are high, and sometimes we overreact. And this case is really about saying, even in those situations, perhaps more than ever in those situations, what, what period of time could be more important for the citizens to address their government than times of extreme crisis like this? It could be the beginning of a long conversation, but I thank Judge Pies and I have nothing further. Okay. Um, thank you, counsel. We appreciate your arguments this morning. The matter is submitted at this time. Thank you. Thank you, Your Honor.
judges: Fernandez, Paez, Tigar